IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

| | | |
|---|---|---|
| **PHILIP JAMES**, individually and on behalf of all those similarly situated, | ) ) | |
| | ) | Case No: |
| Plaintiff,[1] | ) | |
| | ) | |
| v. | ) | **CLASS ACTION COMPLAINT** |
| | ) | **JURY TRIAL DEMANDED** |
| **THE BOEING COMPANY**, a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

_____

[1] This case may be deemed to be "related to" *In re: Boeing 737 MAX Pilots Litigation*, Case No. 19-5008, and the related cases which have been consolidated before Judge Steven C. Seeger. Plaintiff has filed a motion to transfer and consolidate this case with Case No. 19-5008 contemporaneously herewith.

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................4

JURISDICTION AND VENUE .................................................................................................5

PARTIES ...................................................................................................................................6

CLASS ALLEGATIONS ...........................................................................................................8

GENERAL ALLEGATIONS ...................................................................................................10

BOEING DELIBERATELY CONCEALED POTENTIAL CATASTROPHIC DESIGN FLAWS IN A CRIMINALLY CYNICAL EFFORT TO MAXIMIZE PROFIT .........................................................11

BOEING'S DESIGN WAS DEFECTIVE IN THAT IT ERRONEOUSLY ASSUMED CERTAIN CONDITIONS SUPPLEMENTED ITS DESIGN ................................................................................16

BOEING DELAYED A "FIX" OF KNOWN MAX DESIGN DEFECTS...........................................17

THE CRASHES OF JT610 AND ET302 PROVIDED TRAGIC PROOF THAT THE MAX WAS UNSAFE AND REQUIRED GROUNDING......................................................................................19

PLAINTIFF SUFFERED SUBSTANTIAL ECONOMIC DAMAGES AFTER THE GROUNDING31

COUNT 1 – STRICT PRODUCTS LIABILITY ..................................................................32

COUNT 2 – NEGLIGENCE AND WILLFUL AND WANTON CONDUCT ....................................35

COUNT 3 – FRAUDULENT CONCEALMENT.................................................................38

COUNT 4 – FRAUDULENT MISREPRESENTATION ......................................................40

PRAYER FOR RELIEF ...........................................................................................................42

JURY DEMAND ........................................................................................................................... 43

Plaintiff Philip James (the "Plaintiff"), individually and on behalf of all those similarly situated, by and through the undersigned counsel, bring this action for relief against The Boeing Company ("BOEING"), and in support thereof state as follows:

**INTRODUCTION**

This Complaint (the "Complaint") seeks compensation on behalf of the Plaintiff and more than 2,000 pilots who relied on BOEING's representations that the BOEING 737 MAX series aircraft (the "MAX") was not only "safe," but that it offered the "greatest flexibility, reliability and efficiency in the single-aisle market"[2] and that becoming certified to fly the MAX would be an excellent career choice. The relationship between BOEING-certified pilots, like Plaintif, and BOEING is exceptionally close and co-dependent. Pilots rely on BOEING to provide full and complete information – information that only BOEING can provide – on the safe operation of its aircraft, as well as how to manage potential malfunctions, and BOEING relies on pilots to instill the travelling public's trust in BOEING products. Specifically in this instance, BOEING relied on, and fraudulently induced, the Plaintiff's continued willingness to operate the MAX following the tragic crash of Lion Air flight JT610, so that the public would continue to fly – and the airlines would continue to buy – the MAX.

Deciding which aircraft type to fly, almost always to the exclusion of other opportunities, is the most important decision in any commercial pilot's career. When Plaintiff decided to qualify to fly the MAX, he relied on BOEING's many representations and its consistent and deliberate concealment of the MAX's many design flaws – including but not limited to the Maneuvering Characteristics Augmentation System (the "MCAS"). This critical information was available only to BOEING, so Plaintiff was required to place his complete trust in BOEING regarding the MAX's airworthiness, as

_____

[2] https://www.boeing.com/commercial/737max/

well as his ability to manage potential inflight problems when operating the MAX. When BOEING's misrepresentations and concealments were finally discovered, the MAX was grounded and Plaintiff suffered economic damages, including lost wages, reduced flying time, termination, and retraining costs. But for BOEING's concealment of the design flaws, the MAX would never have been certified by the Federal Aviation Administration (the "<u>FAA</u>") and Plaintiff would never have committed his career to flying the MAX.

BOEING – and BOEING alone – caused the Plaintiff's damages and must be held accountable. For the reasons set forth herein, the Plaintiff, individually and on behalf of all those similarly situated, requests entry of a judgment against BOEING in an amount that will make the members of the proposed classes whole, as well as deter BOEING and other manufacturers from prioritizing corporate profits over human life.

## <u>JURISDICTION AND VENUE</u>

1. This Court has original jurisdiction over this matter pursuant to 28 U.S. §1332(d)(2) because this matter is a civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is class actions in which the Plaintiff is a foreign citizen and the Defendant is a citizen of the State of Illinois.

2. This Court has personal jurisdiction over BOEING because BOEING's principal place of business is located in this District, and BOEING does business in this District by designing, promoting, marketing, and selling airplanes in this District.

3. Venue is proper in this jurisdiction pursuant to 28 U.S.C. §1391(b)(1) because BOEING resides in this District, pursuant to 28 U.S.C. §1391(b)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this District, Defendant has intentionally availed itself of

the laws and markets of this district, Defendant intentionally removed these cases to this District, and Defendant is subject to personal jurisdiction in this district.

## PARTIES

4.      Capt. Philip James is the Plaintiff and proposed class representative of the Samoa Airways MAX Pilot Class (as defined herein). Capt. James is an Australian citizen who was employed to fly internationally for Samoa Airways ("Samoa"), the flag carrier for Samoa. Samoa employed Capt James and approx. 10-12 pilots to operate an expected MAX fleet of aircraft. Capt. James has been a commercial pilot for almost 20 years and has previously flown almost exclusively BOEING aircraft.

5.      On February 12-16, 2019, Capt. James began ground school for Samoa in Fiji as Samoa was linked to Fiji Airways at that time, and this training partially involved reviewing the MAX CBT including BOEING's prepared materials, and answering some test questions. The training was led by Fiji Airways instructors at their offices and while the instruction by the Fiji Airways was well done, the training materials they had to rely on from BOEING were rudimentary, and merely considered some minor differences in the location or appearance of certain switches and handles. The airline instructors had been trained by BOEING instructors. Neither the BOEING-created CBT nor the BOEING-trained instructors mentioned the MCAS.

6.      Capt. James completed his CBT BOEING MAX differences training which included two Fiji-required MAX simulator training sessions supervised by Fiji Airways instructors at the Boeing Training & Professional Services centre in Singapore on March 3, 4 and 5, 2019 (just before the ET302 crash). While Capt. James had the opportunity to familiarize himself with a real MAX he never had the opportunity to operate one due to the imminent grounding worldwide of the fleet, and he thus unexpectedly entered an informal furlough status with the airline, without pay, awaiting either return of

6

the MAX to operation or replacement of the aircraft with another type at Samoa. Capt. James expected that his first MAX flight date would be March 18, 2019 but the operation never happened due to the grounding.

7.      He has not been paid by his airline for nearly a year and lives with his wife in the UK with great uncertainty about future flying and an inability to fly in the UK as he does not hold a European licence. Capt. James is now not recent on type due to the grounding which has precluded him from applying for other flying jobs which require recency on type within 6 or 12 months.

8.      Capt. James would not have sought certification on the MAX had he known that the MAX contained the MCAS and/or that BOEING knew that there was no way to safely manage a malfunction of the MCAS. He has lost a significant amount of respect for the BOEING product as he feels much more could have been done to make the MAX program live up to expectations.

9.      At all relevant times, BOEING was, and remains, a Delaware corporation registered with the Illinois Secretary of State as doing business in Illinois, with its corporate headquarters and principal place of business located in Chicago, Illinois.

10.      At all relevant times, BOEING made critical representations and concealed key information with the intent to influence pilots' careers, and made fateful decisions, including the initial decision to represent and continue to represent to the Plaintiff and the public that the MAX was safe and that its training and documentation were sufficient to enable pilots to manage both normal flight and in-flight systems malfunctions. These decisions regarding the design, manufacture and marketing of the MAX airplane were made at its corporate headquarters in Chicago, Illinois.

## CLASS ALLEGATIONS

11.     Plaintiff brings this consolidated action individually and on behalf of the following persons similarly situated, pursuant to Rule 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure: all individuals since May 22, 2017[3] who qualified to fly the MAX (the "Global MAX Pilots Class" or the "Class"), were employed by airlines who received deliveries of the MAX, and who are not included in one of the proposed MAX pilot classes defined in *In re: Boeing 737 MAX Pilots Litigation*, Case No. 19-5008.

12.     The following people are excluded from the Class described in the previous paragraph: (1) any Judge or Magistrate presiding over this action and the members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from a Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) persons who have either in a personal capacity or through a pilot union, at the date of the filing of this Third Amended Consolidated Class Action Complaint, filed an action against BOEING for economic and/or other pilot losses associated with the MAX program; (6) Plaintiff's counsel and Defendant's counsel; (7) the legal representatives, successors, and assigns of any such excluded persons.

13.     **Numerosity**: The exact number of members of the Class is presently unknown, but individual joinder in this case is impracticable. The Classes consists of at least 40 and as many as 2,000 individuals. Members of the Class can be easily identified through the relevant airline employer training records and pilot logbooks.

---

[3] The first day of operation of the MAX in revenue service with Malindo Air.

14.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Classes include but are not limited to the following:

  a.  Whether Defendant's conduct constitutes product liability under Illinois law;

  b.  Whether Defendant's conduct constitutes negligence under Illinois law;

  c.  Whether Defendant's conduct constitutes fraudulent concealment under Illinois law; and

  d.  Whether the Defendant's conduct constitutes fraudulent misrepresentation under Illinois law.

15.     **Typicality**: The Plaintiff's claims are typical of the claims of the other members of the Class. The Plaintiff represents that Plaintiff and the members of the relevant Class sustained damages arising out of Defendant's uniform wrongful conduct.

16.     **Adequate Representation**: The Plaintiff will fairly and adequately represent and protect the interests of the members of the Class, and each of the Plaintiff has retained counsel competent and experienced in complex litigation and class actions. The Plaintiff has no interests antagonistic to any of the members of the Class, and Defendant has no defenses unique to any of the Plaintiff. The Plaintiff is committed to vigorously prosecuting this action on behalf of the members of the Class, and the Plaintiff has the resources to do so. Neither the Plaintiff nor proposed counsel have any interest adverse to the other members of the Class.

17.     **Superiority**: This class action case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of any of the Class will likely be small relative to the burden and expense of

9

individual prosecution of the complex litigation necessitated by Defendant's wrongful conduct. Thus, it would be virtually impossible for any of the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

## GENERAL ALLEGATIONS

18.    BOEING and Airbus SE ("Airbus") maintain a global duopoly of the commercial aircraft manufacturing industry with the two companies making up 99% of commercial jet orders worldwide.

19.    In 2011, BOEING learned that some of its most important customers were planning to place orders for the Airbus A320neo, a new airplane model that Airbus advertised as the world's most advanced and fuel-efficient single-aisle aircraft.

20.    If it could not compete with the A320neo, BOEING stood to lose a tremendous amount of money and market share.

21.    BOEING determined that it would take too long to design and manufacture a new airplane to compete with the Airbus A320neo, and instead made the fateful decision to modify an existing 737 model, the Boeing 737NG, to what would become the MAX.

22.    The program, included developing a product that could compete with the Airbus A320neo based on the Boeing 737NG model, rather than designing a new airplane. This decision was made by BOEING to increase BOEING's profit, because:

a. Basing the design of the MAX on the existing Boeing 737NG design saved BOEING significant design and development costs;

b. Using the existing Boeing 737NG design permitted BOEING to rush the design and manufacture of the MAX and get it to market quickly so that BOEING would not lose business or market share to Airbus;

c. Using the existing Boeing 737NG design permitted BOEING to offer the MAX to its customers with an added selling point that pilots already qualified to fly the Boeing 737NG could qualify to fly the MAX without undergoing any costly or significant training, and without needing to be trained and tested in flight simulators and/or in the airplane before flying revenue-generating flights; and

23. Using the existing Boeing 737NG framework permitted BOEING to take advantage of its Organization Designation Authorization (the "ODA"), granted to it by the FAA, to streamline and speed the certification of the MAX as an amendment to the Boeing 737 type certificate, rather than an entirely new aircraft design type.

**BOEING DELIBERATELY CONCEALED POTENTIAL CATASTROPHIC DESIGN FLAWS IN A CRIMINALLY CYNICAL EFFORT TO MAXIMIZE PROFIT**

24. In designing the MAX, BOEING made multiple modifications and updates to the structure and flight control systems of the BOEING 737NG, including the incorporation of larger, more fuel-efficient CFM LEAP-1B engines that significantly altered the aircraft's aerodynamics.

25. To accommodate the CFM LEAP-1B engines, BOEING had to mount the engines higher and farther forward on the MAX's wings and modify the airplane's nose gear to provide ground clearance.

26. The more powerful engines and their new location gave the MAX a propensity to abnormally pitch up under certain flight conditions, creating a risk that the airplane would suffer an aerodynamic stall and crash.

27. As early as 2016, BOEING knew that the design of the MAX was in contravention of FAA regulatory standards, including but not limited to the FAA's Airworthiness Standards for

Commercial Aircraft, 14 C.F.R. Sec. 25.203(a) – Stall Characteristics, which states in relevant part as follows:

> No abnormal nose-up pitching may occur…. In addition, it must be possible to promptly prevent stalling and to recover from a stall by normal use of the controls.

28.     Nonetheless, BOEING pressed on with the development of the MAX and incorporated the newly developed MCAS to mitigate the risk of a potential stall and to force the MAX to behave more like the Boeing 737NG. The MCAS was intended to alleviate the risk of stalling. The MCAS, however, exposed the aircraft to an even greater risk of incorrect pitch down commands to the flight controls and rapid descent into terrain.

29.     BOEING knew that the MCAS as designed with a single source of AOA exposed the MAX to the consequences of a single source failure. Nonetheless, BOEING took no steps to thoroughly consider the cascade of consequential failures of the system reliant on the single AOA source. BOEING knew or should have known the potential for the high workload during take-off and the diversion of the crew's attention from the real possibility of an MCAS event following flaps retraction after take-off. The result was evidenced in the crash of JT610.

30.     From at least as early as mid-2018, BOEING through many pilots and engineers, including senior test pilots (including but not limited to Capt. Jennifer Henderson, Capt. Patrik Gustavsson, Capt. Jim Webb, and Capt. Mark Forkner) knew and/or should have known of the failure but did not take action thereby creating the likelihood that the MAX would crash, leading to the inevitable grounding of the MAX.

31.     As early as 2013, BOEING was aware that there were "egregious" problems with the MCAS that rendered the MAX unsafe to operate. However it was only between October 2019 and January 2020 that BOEING allowed the release of messages and memos between its staff and test pilots

from a range of dates between February 26, 2013 and December 12, 2017 (including messages between Capt. Mark Forkner, Capt. Patrik Gustavsson, and others, recognizing that there were "some real fundamental issues" with the MAX) in a transcript sent by BOEING to the U.S. House Committee on Transportation and Infrastructure.

32.     Such emails indicate the lengths BOEING was apparently willing to go to in order to evade scrutiny from regulators, flight crews including Plaintiff, and the flying public, even as its own employees were sounding alarms internally, and demonstrate that:

a.  BOEING knowingly and repeatedly hid significant information on the MAX systems from airline customers, regulators and pilots for over 6 years before the JY610 crash;

b.  Capt. Mark Forkner forcefully persuaded foreign airline customers of BOEING to accept that no MAX simulator training should be required of pilots even though he knew he was "tricking" them;

c.  Capt. Mark Forkner used other intimidatory tactics against airlines and regulators to preserve BOEING's commercial timeline notwithstanding the risks to safety;

d.  Meetings about the MAX project all focused on commercial deadlines rather than the delivery of quality;

e.  The BOEING Chief Technical Pilot ("CTP") for the 737 repeatedly insisted internally at BOEING that it was unacceptable for the program for pilots to be required to be trained on the MAX in simulators notwithstanding objections from other BOEING staff and knowing new systems were being misdescribed or concealed from customers and pilots;

f.  The BOEING CTP actively concealed from airline customers and their pilots elements of the MAX systems such as MCAS with a view to convincing them to require less training of their pilots than actually required to commence operations on the MAX;

g.  An internal directive existed at BOEING that the MCAS was not to be referred to as a new function due to the likely greater certification and training impact and emphasized, instead, that MCAS was to be presented at all times as merely an addition to the existing Speed Trim flight control system; and

h. BOEING rejected a proposal to add a new flight control system to the MAX called synthetic airspeed that several engineers said might have prevented the two MAX crashes.

33. BOEING also knew at least as early as November 2018 that the FAA concluded that the MAX posed an unacceptable level of risk and that additional crashes could be expected every couple of years.

34. BOEING made the deliberate decision not to disclose and to actively conceal the above-referenced information from BOEING MAX-certified pilots, like Plaintiff, the FAA, and even BOEING's own engineers and instructors.

35. BOEING consistently and deliberately failed to disclose and actively concealed the existence of the MCAS and information on how to manage its malfunction of the MCAS from the Plaintiff because disclosing it would threaten the MAX's certification or following its introduction into service, would result in an immediate grounding of the new planes until it could be fixed and pilots could be retrained – a delay in the roll-out of the MAX that would cost BOEING millions of dollars that BOEING wanted desperately to avoid.

36. BOEING was willing to place the life of the Plaintiff, his crews, and the travelling public at risk to avoid losing money associated with an even temporary grounding of the MAX.

37. BOEING decided not to provide MAX pilots and did not provide MAX pilots, including Plaintiff, with the training or information necessary to disengage a malfunctioning MCAS without losing their ability to control pitch with the airplane's electric pitch trim.

38. BOEING decided not to inform MAX pilots and did not inform MAX pilots, including Plaintiff, that the MCAS would automatically force the airplane's nose toward the ground if an angle of attack ("AOA") sensor "told" the system that the nose of the airplane was angled too high.

14

39.   BOEING decided that MAX pilots, including Plaintiff, should not be required, and ensured that MAX pilots would not be required, to undergo any MCAS training.

40.   Each of BOEING's decisions set forth herein was made by BOEING to facilitate sales of the MAX, regardless and in spite of safety concerns, so that BOEING could continue to tell its airline customers that MAX pilots could fly revenue-generating routes as quickly as possible and sell more MAX planes, and accordingly required several levels of concealment of information.

41.   As a result of BOEING's decisions, Plaintiff did not receive any suitable training or testing on how to handle emergencies caused by or exacerbated by the MCAS or its malfunctioning.

42.   BOEING knowingly failed to conduct a proper failure modes and effects analysis during development of the MAX because such testing would have exposed the MAX's faulty design and prevented BOEING from representing that the airplane's MCAS was safe.

43.   BOEING either failed to properly consider the likelihood that AOA sensors may fail and mistakenly trigger the MCAS to push MAX airplanes into a dive toward the ground, or ignored that scenario because acknowledging it would negatively impact sales of the MAX.

44.   BOEING did not sufficiently test the MCAS during development to ensure that the automated system would not create a safety of flight problem if it were to receive erroneous data from one of the airplane's AOA sensors.

45.   The MCAS was essential to BOEING's aggressive business plan of quickly designing, manufacturing, and selling the MAX, because the airplane could not otherwise appear certifiable to the FAA and BOEING could not compete with Airbus without it.

46.   BOEING's decisions to approve the MAX program and to consistently and deliberately conceal the Design Defects from the Plaintiff and others were made in Chicago, Illinois, at the highest levels of the company and done with the complicity of BOEING's production test pilots and engineers.

15

## BOEING'S DESIGN WAS DEFECTIVE IN THAT IT ERRONEOUSLY ASSUMED CERTAIN CONDITIONS SUPPLEMENTED ITS DESIGN

47.     BOEING made certain assumptions about the operation of its MAX aircraft by pilots which proved partially causative of the Lion Air flight JT610 ("JT610") and Ethiopian Airlines flight ET302 ("ET302") crashes, and which should have been more appropriately guarded against by BOEING. Some examples of negligent or wilfully and knowingly erroneous assumptions include but may not be limited to the following:

a. BOEING assumed that uncommanded stabilizer motion is readily recognizable to the crew because of unintended flight path changes and unexpected motion of the manual trim wheel. This is erroneous, however, because of the potential for distractions with IAS DISAGREE and ALT DISAGREE alerts. BOEING did not anticipate that pilots might receive conflicting or additional warnings and caution lights on the flight-deck coincidental to or prior to MCAS activation, which may distract the crew from the root cause of the problem and its solution. BOEING merely desired and/or assumed the crew would immediately perform the Runaway Stabilizer Trim memory items.

b. BOEING assumed that MCAS motion would be limited to one movement of a maximum authority of 2.5 degrees and it can be controlled by control wheel electric trim inputs alone. This is false.

c. BOEING assumed that the crew will in all cases react to high control column forces and trim them out even when uncommanded trim inputs occurred. This is false.

d. BOEING assumed that it was appropriate to rely on trained crew procedures, especially memory items. BOEING assumed a crew would react within 3 seconds which is inappropriate and unreasonable. This assumption, however, requires the association of the current warnings or cautions to a root cause so that then defined actions can be identified. This was not the case in the JT610 crash (at least) and is supported by the fact that BOEING issued a Bulletin after the crash.

e. BOEING recognized that training for AOA failures was required to ensure crew recognized the problem, however BOEING sought to sidestep the issue by relying on the Airspeed Unreliable Non-Normal Checklist (NNC) and Runaway Stabilizer NNC to provide "guidance and training". This did not reflect the likelihood of crews misidentifying the main issue and only attempt the Airspeed Unreliable NNC which was a questionable response in any case and in the event of the JT610 crash not completed properly. It would seem BOEING took this stance to ensure the differences training for the MAX would not require simulator training.

f.  BOEING assumed that crews were completely reliable and would respond correctly and reliably, including for example that an average flight crew could counter an MCAS failure; however, this presumes a standard of "average" in the worldwide Boeing 737 pilot community which is unrealistic, particularly in the absence of any information about MCAS being given to pilots. BOEING assumed matters in respect of the average pilot's likely response and abilities based on observed responses of highly trained test pilots and pilots associated with certification, having full systems knowledge. This skewed the observed responses to favour BOEING's basic assumption.

48.  BOEING assumed crew responses to uncommanded MCAS activation were based on the problem being easily recognizable and countered; that responses would not require exceptional skill or strength; pilots would take immediate action and trim out the control forces; and memory items would be followed. However, these assumptions proved to be incorrect in the aftermath of the JT610 crash. Each of these assumptions was false.

## BOEING DELAYED A "FIX" OF KNOWN MAX DESIGN DEFECTS

49.  In marketing the MAX to potential owners and operators, BOEING offered a number of optional for-purchase safety upgrades, once again placing its business interests ahead of safety.

50.  Those optional safety upgrades included the AOA Indicator which was found by BOEING in 2017 to be erroneously linked by display system software to the AOA Disagree alert, which meant that the AOA Disagree alert did not meet relevant requirements. In particular, only if the AOA Indicator was purchased and installed would the AOA Disagree alert provide valuable safety information to pilots and assist them in the diagnosis of a safety issue.

51.  BOEING did not offer the AOA Indicator as standard in the MAX because it wanted to be able to offer a base model of the MAX at a low price point in order to make it more competitive relative to the Airbus A320neo, while at the same time profiting on the sale of the optional safety features to the airline customers that ordered it.

52.     BOEING and the FAA permitted the MAX to be certified and sold without AOA Indicator and Disagree alert, thus depriving flight crews of critical information and in doing so, contributing directly to the crashes of JT610 and Ethiopian Airlines flight ET302 and the inevitable grounding of the MAX fleets.

53.     Even aircraft equipped with the AOA Indicator and Disagree alert were unreasonably dangerous, as BOEING failed to disclose the existence of the MCAS to the airlines and their pilots and failed to provide adequate training on the new aspects of the MAX's design and equipment.

54.     Even if purchased, the optional AOA Indicator and Disagree alert alone are insufficient for pilots to diagnose pitch control issues such as why the nose of the aircraft continues to pitch down, and thus is not enough to prevent an accident triggered by the MCAS.

55.     Knowledge of the presence of the MCAS was essential for pilots to understand why the nose of the aircraft might repeatedly pitch down. An awareness and understanding of the MCAS, including adequate simulator training, could have allowed pilots to take proper action quickly, thus increasing survivability chances in emergency situations.

56.     BOEING's failure to disclose the existence of the MCAS to pilots, including Plaintiff, practically ensured that, in the event of a malfunctioning AOA sensor, the MCAS would drive the MAX into the ground killing everyone on board.

57.     Furthermore, BOEING's failure to develop and disseminate training on how to recover from MCAS-created nose down situations, including manual trim training when in a severe out of trim situation, increased the risk of accidents.

58.     Thus, by not disclosing and actively concealing the existence of the MCAS and by not developing nor disseminating adequate training or at the very least indicating to MAX pilots that specific training might be required for MCAS-induced and MCAS-error situations, BOEING knowingly

18

compromised the safety of the Plaintiff and others similarly situated, as well as the crews and passengers entrusted to their care.

59.     BOEING also drove its employees and contractors to unsafe work production levels and ignored complaints that its significantly expedited production schedule and disregard of quality for the MAX was inherently unsafe.

60.     BOEING was fairly warned that issues in design and production that faced the MAX were perceptible to its workers because it ignored its employees' and contractors complaints that its work production expectations and production schedule were causing manufacturing mistakes, including dangerous mistakes concerning the airplane's wiring. Indeed, employees reported that BOEING's manufacturing process had caused foreign object debris to be left in MAX airplanes which could pose dangers to the airplane's wiring, including wiring associated with the airplane's AOA sensors and Flight Control Computer.

## THE CRASHES OF JT610 AND ET302 PROVIDED TRAGIC PROOF THAT THE MAX WAS UNSAFE AND REQUIRED GROUNDING

61.     On October 28, 2018, Flight JT610 crashed into the Java Sea about 11 minutes after takeoff from Jakarta, Indonesia, killing everyone on board.

62.     At least as early as the crash of JT610, BOEING knew and accepted that the MCAS was defective and was secretly working on a software fix to address its defects.

63.     At least as early as the crash of JT610, BOEING knew and accepted that the AOA Indicator and Disagree alert software link on the MAX display system software was defective and was secretly working on a software fix to address its defects.

64.     Despite knowing that the AOA Indicator and Disagree alert software link on the MAX display system software were flawed, BOEING did not intend to release a fix until it issued its normal software update in 2020.

65.     On November 6, 2018, BOEING issued TBC-19 to MAX pilots warning that the MAX's AOA sensors can produce erroneous indications causing the MAX to enter into an aggressive dive.

66.     The Bulletin made no mention of the MCAS or how to disable it apart from reliance on the generic Runaway Stabilizer Trim NNC despite more direct measures available to prevent MCAS activation in the take-off phase. This was so notwithstanding its clear implication in the crash due to the circumstances of the crash as later evidenced by the official accident investigation report of the JT610 crash, and as set out above. The Bulletin also did not inform MAX pilots that the MCAS would repeatedly cause the MAX to enter an aggressive dive; in short, the Bulletin alerted MAX Pilots to a danger, but provided them with wholly inadequate means of managing it.

67.     On November 8, 2018, the FAA the issued an Emergency Airworthiness Directive (the "AD") ordering Boeing to correct its omissions:

> This emergency AD was prompted by analysis performed by the manufacturer showing that if an erroneously high single AOA sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer. This condition, if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain.
>
> * * * *
>
> We are issuing this AD because we evaluated all the relevant information and determined the unsafe condition described previously is likely to exist or develop in other products of the same type design. Due to the need to correct an urgent safety of flight situation, good cause exists to make this AD effective in less than 30 days.

20

68.     The AD went on to order BOEING to modify its manual on the MAX to include the specific warnings and instructions on procedures to respond to the symptoms of (but still not explicitly referenced as) an erroneously triggered MCAS.

69.     Despite BOEING's knowledge that these design flaws existed and likely were responsible for crash of JT610 and the deaths of everyone on board, BOEING continued to represent that the MAX was safe to fly.

70.     In October 2019, consistent with the original Pilot X's allegations, Indonesia's National Transportation Safety Committee ("KNKT") published its final 322-page accident investigation report on the JT610 crash. The report found that the crash of JT610 was caused by a multitude of factors, and highlighted the combination of an improperly aligned AOA sensor, lack of pilot reporting, and training. The report also noted the breakdown in safety oversight during the MAX certification process and BOEING's failure to disclose design flaws with the FAA prior to and after certification.

71.     On October 11, 2019, the Joint Authorities Technical Review ("JATR"), a committee formed by the FAA Associate Administrator for Aviation Safety to study the crash of JT610 and the MAX, issued a report recommending that the FAA review compliance by BOEING in respect of the MAX to 14 CFR §§ 25.1329 (Flight Guidance System), 25.1581 (Airplane Flight Manual – General), and 25.201 (Stall Demonstration).

72.     On March 10, 2019, less than five months later after the crash of JT610, Flight ET302 crashed about six minutes after takeoff from Addis Ababa, Ethiopia, killing everyone on board.

73.     The MAX aircraft involved in the JT610 and ET302 were two of only 357 MAX aircraft in service at the time.

74. Following the crash of ET302, BOEING revealed to the public that it had been developing a flight control software "enhancement" for the MAX for several months, supposedly to make an already safe aircraft "even safer."

75. The crashes demonstrated what BOEING had secretly known and actively concealed for years: the MAX was unsafe; it violated the FAA's Airworthiness Standards for Commercial Aircraft; and, it had to be grounded until the design flaws could be fixed or its design could be significantly overhauled.

76. These options, however, were untenable to BOEING because they threatened future deliveries of the MAX to BOEING's customers who had already purchased the planes.

77. Despite the two devastating crashes and loss of life and its awareness of the design flaws, BOEING continued to represent that the MAX was safe; BOEING also used its influence over the FAA to convince the FAA not to ground the planes and keep them in service.

78. Nonetheless, after the crash of ET302, several airlines recognized that the MAX was not safe and voluntarily grounded their MAX fleets.

79. Underscoring the danger that the MAX presented, several major national aviation authorities ordered that MAXs on their territory be grounded, and at least one national aviation authority took the additional step of refusing to allow non-revenue ferrying of a MAX aircraft – without any passengers on board – to enter its national airspace.

80. The grounding of the MAX effectively put the Plaintiff and other pilots qualified to fly the MAX out of work and required them to either wait out the grounding or initiate training to transition to other aircraft.

**BOEING CULTIVATED AND RELIED UPON ITS "SPECIAL RELATIONSHIP" WITH PLAINTIFF**

81.     BOEING cultivates a relationship of trust and confidence with BOEING-certified pilots because without their trust and confidence, BOEING would have a much more difficult time selling planes to its airline customers. In other words, without MAX-certified pilots available to fly the planes, BOEING airline customers would not buy the planes.

82.     On April 24, 2019, in Chicago, Illinois, BOEING CEO Dennis Muilenburg recognized the special relationship between BOEING and BOEING-trained and certified pilots when he acknowledged BOEING's reliance on MAX-certified pilots, like the Plaintiff, to "re-earn the trust of the flying public."[4] Put another way, BOEING acknowledged its dependence on MAX-certified pilots to show confidence in the MAX if and when the grounding is lifted, to entice the travelling public to follow.

83.     Pilots qualified to fly BOEING-type aircraft, like Plaintiff, rely on their special relationship with BOEING for training, information, their safety, their livelihoods, and the safety of the crew and passengers entrusted to their care.

84.     BOEING-certified pilots, like the Plaintiff, rely entirely on BOEING for representations regarding what systems were incorporated into the MAX, and how to manage them in the case of a malfunction.

85.     To become certified or "type rated" on a type of BOEING aircraft, e.g., the Boeing 737, pilots either train directly at a BOEING training facility with BOEING instructors, or at a third-party

---

[4] In this respect, BOEING's "public face," its MAX-certified pilots, have quite a job ahead of them. According to a poll conducted by Bank of America, 60% of 2,135 travelers polled would wait at least six months before boarding a MAX and only 20% believe the aircraft will be safe and would be willing to board it immediately if and when the grounding is lifted.

training facility with instructors who were trained by BOEING instructors, using information and training materials prepared by BOEING.

86.     In a shocking effort to conceal the design flaws of the MAX, including the MCAS, BOEING concealed the information from some of its own instructors and engineers. This way, they could not leak the information to pilots, airline flight instructor trainees, or the FAA.

87.     BOEING dictates the type of training and the scope of the information provided during training. For example, BOEING determined that for 737-certified pilots to become qualified to operate the MAX, all they needed to do was review a brief iPad presentation that was prepared by BOEING.

88.     Aircraft are incredibly complex machines and system malfunctions happen. If there was no safe way to manage the malfunction of a certain system, BOEING must disclose that to pilots so that they can determine whether to tie their own safety and their careers to the operation of the MAX.

89.     Neither the pilots nor BOEING's airline customers have the ability to know what systems have been incorporated into a BOEING aircraft without genuine and good faith BOEING information. If these systems – and how to manage them in the case of a malfunction – are not disclosed or are actively concealed by BOEING, the pilots cannot safely operate the aircraft.

90.     BOEING-certified pilots, like the Plaintiff, would not have agreed to operate the MAX had they known that there were systems on the MAX that could not be safely managed in the case of a malfunction; rather they would they have continued to operate the Boeing 737NG, other BOEING types, an Airbus aircraft type, or another manufacturers' aircraft types.

91.     BOEING-certified pilots, like the Plaintiff, are not comparable to bus drivers, baggage handlers, or airport café baristas.[5] None of these workers are responsible for driving the means of

---

[5] *See* Defendant's Memorandum in Support of its Motion to Dismiss (Dkt. #73), at 8-9 (equating MAX-

commercial air travel for which the airport environment exists and are thus not intimately connected with BOEING in the same way.

92.     In recognition of its special relationship with BOEING-certified pilots, BOEING representatives visit airlines and pilots, actively sponsor pilot organizations, incentivize the training of more BOEING pilots, and influence the pilot training market by curating and publishing pilot and related skill shortage data together with recommendations for how training can be made more efficient, thus facilitating further sales of their own aircraft.[6]

93.     To put it another way, the special relationship that BOEING has cultivated with BOEING-certified pilots, like the Plaintiff, does not exist between BOEING and other individuals, including flight attendants, passengers, other airline employees, or airport employees.[7]

## BOEING CONSISTENTLY AND INTENTIONALLY CONCEALED THE EXISTENCE OF THE MCAS AND OTHER UNMANAGEABLE SYSTEMS ON THE MAX FROM PILOTS

94.     With the delivery of each MAX, BOEING included the BOEING 737/MAX Flight Crew Operations Manual, also known as the FCOM.

95.     The FCOM is a 1,500-plus page manual that was prepared by BOEING and periodically revised and updated by BOEING to facilitate the "safe and efficient" operation of the MAX, and is

---

certified pilots, who trusted their lives and livelihoods to information that only BOEING could provide, to baggage handlers and airport café employees in support of an empty "ripple effect" argument).

[6] https://www.boeing.com/commercial/market/pilot-technician-outlook/

[7] BOEING recently settled the claim of Southwest Airlines for an undisclosed amount of money and discounts. Southwest used $125 million of those funds from BOEING to pay its pilots and other employees for economic losses. Additionally, on November 8, 2019, the Southwest Airlines Pilots Association, recognizing the unique relationship between pilots and BOEING and the unique damages suffered by pilots, filed an action similar to this case. *See Southwest Airlines Pilots Ass'n v. The Boeing Company*, Case No. 19-02680 (N.D. Tex).

particular to airline customers of BOEING who are required to issue it or make it accessible to their pilots.

96.     The FCOM and the periodic bulletins are direct communications by BOEING to each new pilot wishing to become rated on the aircraft, including the Plaintiff.

97.     Reviewing the FCOM and understanding its contents is required for a pilot to be qualified on the MAX. Pilots rely on the information provided by BOEING in the FCOM in order to safely operate the MAX.

98.     In March 2016, BOEING deleted information about the MCAS from the draft FCOM and took steps to make sure that it would not be mentioned in pilot training because BOEING's testing of the MAX had revealed that the MCAS could and would malfunction and cause the MAX to crash at an alarming and unprecedented rate killing everyone on board.

99.     BOEING knew that disclosing what it knew about the MCAS and the inability for pilots to manage any malfunction to the FAA would prevent certification, which would prevent sales of the MAX.

100.    To expedite the FAA's certification of the MAX and facilitate deliveries of the MAX, BOEING made the deliberate and conscious decision to remove and conceal any information about the MCAS and pilots' inability to safely manage it in the case of a malfunction.

**FCOM Rev. 1**

101.    On February 15, 2018, BOEING sent a revised FCOM ("FCOM Rev. 1") to MAX-qualified pilots, including the Plaintiff.

102.    As BOEING intended, the Plaintiff received and reviewed FCOM Rev. 1 on or about February 15, 2018.

26

103.     On page one of FCOM Rev. 1, BOEING states the following:

> Boeing claims copyright in each page of this document only to the extent that the page contains copyrightable subject matter. Boeing also claims copyright in this document as a compilation and/or collective work.

104.     Also on page 1 of FCOM Rev. 1, BOEING also represents that "Treatment of the document and the information it contains is governed by contract with Boeing."

105.     Additionally, on page 7 of FCOM Rev. 1, BOEING represents that "[t]his revision reflects the most current information available to The Boeing Company 60 days before the subject revision date."

106.     In the entirety of FCOM Rev. 1, however, BOEING makes no mention of the MCAS or how to manage it in the case of a malfunction, information that was clearly "available to The Boeing Company 60 days before the subject revision date," contrary to BOEING's representation on page 7 of the same document.

## FCOM Rev. 2

107.     On February 21, 2018, BOEING issued Revision Number 2 ("FCOM Rev. 2") to the FCOM to the Plaintiff. Again, BOEING claimed copyright to each page of the FCOM Rev. 2.

108.     As BOEING intended, the Plaintiff received and reviewed FCOM Rev. 2 on or about February 21, 2019.

109.     On page 7 of FCOM Rev. 2, BOEING represented to the Plaintiff that the purpose of the FCOM is to:

> provide the necessary operating limitations, procedures, performance, and systems information the flight crew needs to *safely and efficiently operate the 737 airplane during all anticipated airline operation*.

27

(emphasis added).

110. On page 17 of the FCOM Rev. 2, BOEING provided a list of the Abbreviations used in the manual. It listed "MCAS" and defined the acronym as the "Maneuver Characteristics Augmentation System."

111. The acronym "MCAS" or the Maneuver Characteristics Augmentation System, however, is never again mentioned in FCOM Ver. 2, and BOEING provided Plaintiff with no information about MCAS, how the system operated, or how to manage it in the case of a malfunction.

112. On information and belief, previous (unreleased) drafts of the FCOM Ver. 2 provided information about MCAS. BOEING removed and concealed this information after BOEING internal testing of the MAX's systems revealed that the MCAS was defective and could cause the plane to crash, which could slow certification and sales and lead to a temporary grounding of the MAX fleet.

113. Had Plaintiff known about MCAS and that BOEING knew that there was no safe procedure for managing it in the case of a malfunction, Plaintiff would not have agreed to operate the MAX and would have continued flying other, safe aircraft types.

**FCOM Rev. 3**

114. On June 3, 2018, BOEING issued Revision Number 3 ("FCOM Rev. 3") to the 737 NG/MAX Flight Crew Training Manual. FCOM Rev. 3 was prepared by BOEING, and BOEING claimed a copyright to the information contained in FCOM Rev. 3.

115. As BOEING intended, the Plaintiff received and reviewed FCOM Rev. 3 on or about June 3, 2018.

116. In FCOM Rev. 3, BOEING removed any reference to MCAS, including from the Abbreviations list, thus further concealing its existence from Plaintiff.

28

**FCOM Rev. 4**

117.    On January 30, 2019, after the Lion Air crash, BOEING drafted and published Revision No. 4 to the to the FCOM ("FCOM Rev. 4").

118.    As BOEING intended, the Plaintiff received and reviewed FCOM Rev. 4 on or about January 30, 2019.

119.    At page 15 of FCOM Rev. 4, BOEING represented that the information contained therein reflected "the most current information available to The Boeing Company 45 days before the subject revision date."

120.    BOEING represented at page 35 of Rev. 4, that "[t]he flight-training program prepares the student for airplane qualification and/or the FAA Type Rating checkride (or equivalent). Flight safety, passenger comfort and operational efficiency are emphasized."

121.    FCOM Rev. 4 did not mention MCAS – not even in the Abbreviations section – or recommend any "maneuvers and techniques" for managing its malfunction.

**TBC-19**

122.    Shortly after the Lion Air crash, on November 6, 2018, BOEING sent TBC-19 to Plaintiff and other MAX-qualified pilots.

123.    As BOEING intended, the Plaintiff received and reviewed TBC-19 on or about November 6, 2018.

124.    BOEING represented via TBC-19 that there was a possibility of an "uncommanded nose down stabilizer trim due to erroneous Angle of Attack (AOA)" and recommended a procedure to

manage it. BOEING knew, however, that the recommended procedure was entirely inadequate and would not prevent future crashes of the MAX in the event of another, inevitable, MCAS malfunction.

125.    TBC-19 was clearly referring to the malfunction of the MCAS that caused the fatal crash of Lion Air and was calculated by BOEING to assure Plaintiff that the MAX was safe by concealing information about MCAS.

126.    In TBC-19, BOEING did not disclose the MCAS, continued its concealment of the MCAS, and represented by implication that, despite the Lion Air crash, the MAX was safe to operate, did not contain design flaws, and would not be grounded.

**MAX CBT**

127.    BOEING concluded that, in order for a pilot already certified to operate the BOEING 737, the only additional training necessary to qualify to operate the MAX was reviewing the brief CBT, which was prepared by BOEING, and did not mention the MCAS. BOEING did not require costly and time-consuming simulator training to qualify to fly the MAX because reduced training cost would increase sales of the MAX.

128.    BOEING did not update the CBT to reference the MCAS or its potential to malfunction and/or whether there was any procedure for safely managing a malfunction of the MCAS – *even after the crash of JT610.*

129.    The Plaintiff received, reviewed, and relied upon the information provided by BOEING in the CBT, the FCOM, and the bulletins prepared by BOEING and communicated to Plaintiff.

## PLAINTIFF SUFFERED SUBSTANTIAL ECONOMIC DAMAGES AFTER THE GROUNDING

130.     Pilots typically undergo extensive training to become "rated" to fly one type of aircraft. In other words, a pilot rated to fly the BOEING 737, like Plaintiff, cannot simply switch to flying the BOEING 787 or the Airbus A380.

131.     Additionally, ratings must be constantly maintained with additional training and flight time, so that a pilot rated to fly the BOEING 747 who transitions to the 737 will quickly lose their rating on the 747 and not be "current" to fly the 747.

132.     Many pilots, including Plaintiff, transitioned to the MAX based on BOEING's representation that it was a safe aircraft that would remain in operation for years.

133.     When the MAX was grounded, MAX pilots, including Plaintiff, were suddenly without aircraft to fly or their flying time was reduced or eliminated altogether. Many of them were terminated and forced to spend significant personal time, effort and finances to train to receive a rating on a different aircraft, including regaining currency on those types flown previously.

134.     The grounding of the MAX directly reduced, or in some cases eliminated, Plaintiff's income and significantly interrupted his career; the grounding was especially costly to pilots just starting their careers as well as those changing jobs to work for an airline that operated the MAX, or those nearing mandatory international retirement at the age of 65.

135.     As a result of the grounding of the MAX, many pilots have had to relocate their "base airport" at their own expense, disrupting their personal lives and the lives of their families.

136.     Safety should never be an option in the design, manufacture and sale of a commercial airplane. BOEING maintains that: "[s]afety is the primary consideration when Boeing engineers design an airplane. In addition to meeting regulatory requirements before certification, each airplane model

must meet Boeing's time-proven design standards. Often these standards are more stringent than regulatory requirements."

137.   BOEING's acts and omissions detailed throughout this Complaint demonstrate that BOEING placed – and continues to place – corporate profits above human life of crews and passengers, notwithstanding the exceptionally special relationship BOEING has with pilots of its aircraft.

## COUNT 1 – STRICT PRODUCTS LIABILITY

138.   The Plaintiff hereby incorporate and reallege each of the preceding paragraphs as though fully set forth herein.

139.   At the time when BOEING sold the MAX, the design of the airplane was defective and unreasonably dangerous in at least one or more of the following respects:

     a.   The engine placement on the MAX negatively disrupted the airplane's longitudinal stability, causing a propensity for dangerous nose-up pitching during critical phases of flight;

     b.   The MAX was equipped with defective AOA sensors that were prone to failure;

     c.   The AOA sensors transmitted inaccurate, invalid and/or implausible data that could trigger the airplane's stall warning system which in turn activated the airplane's MCAS, causing the airplane to experience uncommanded pitches down toward the ground;

     d.   BOEING's defective design causes the MCAS to activate based on the single input of a failed AOA sensor without cross-checking its data with another properly functioning AOA sensor;

     e.   BOEING's defective design causes the MCAS to accept erroneous and even implausible data or information inputs as valid;

     f.   BOEING's defective design causes the MCAS to repeatedly activate based on inaccurate and implausible data supplied by a malfunctioning AOA sensor; even as pilots might desperately fight to pull the airplane out of a dive commanded by the MCAS;

g. BOEING failed to design the MAX with the capability to provide the Plaintiff and the members of the Class with sufficient and timely warning that the airplane's MCAS system has been activated;

h. The MAX's design was defective, in part, because it was not as standard equipped with the AOA Indicator;

i. The MAX's design was defective, in part, because it was not as standard equipped with the AOA Disagree alert;

j. The MAX's design was defective because its manual pitch trim wheel is too difficult for the average pilot to control with authority in an emergency situation; and

k. The FCOM and other aircraft documentation and training materials failed to include any information about the MCAS or recommended procedures to manage it in the case of a malfunction.

140. By reason of BOEING's design choices, the MAX was vulnerable to a single point of failure.

141. BOEING knew the MAX could fail to perform as safely as airlines and pilots were entitled to expect.

142. BOEING failed to come up with a safer design even though the technology available to them enabled them to design a safer product.

143. At the time when BOEING sold the MAX, there was a manufacturing defect and the aircraft was unreasonably dangerous in at least one or more of the following respects:

a. BOEING equipped the MAX with defective AOA sensors that were prone to failure;

b. The AOA sensors at times transmitted inaccurate, invalid and/or implausible data that could trigger the airplane's stall warning system, which in turn would cause the airplane to experience uncommanded pitches down toward the ground; and

c. BOEING's design of the MCAS required input from only one rather than two or more redundant AOA sensors thus introducing a single point of failure; and

d. The FCOM and other aircraft documentation and training materials failed to include any information about the MCAS or recommended procedures to manage it in the case of a malfunction.

144. At the time when the MAX was sold, BOEING failed to give adequate warning to airlines and pilots:

     a. BOEING failed to properly and effectively warn the airlines and pilots of the existence of the MCAS when they knew such system involved risks;

     b. BOEING failed to properly and effectively warn pilots that the MCAS was capable of causing the MAX's horizontal stabilizer to repeatedly pitch the airplane's nose down;

     c. BOEING failed to properly and effectively warn airlines and pilots that inaccurate data inputs supplied by the MAX's AOA sensors could cause the MCAS to initiate repeated uncommanded nose-down conditions;

     d. BOEING failed to properly and effectively warn MAX pilots that the MCAS would reset itself each time pilots pulled the nose of the airplane up after the MCAS caused the airplane to dive as a result of erroneous and implausible data from a malfunctioning AOA sensor;

     e. BOEING failed to properly and effectively warn MAX pilots after the crash of JT610 that the MAX was defective, and that BOEING was developing a software fix to cure the defect that contributed to the JT610 crash;

     f. BOEING failed to properly and effectively instruct MAX pilots how to recognize and deal with runaway stabilizer trim caused by the improper activation of the MCAS; and

     g. BOEING failed to properly and effectively instruct MAX pilots how to recover from a severe out of trim situation manually.

145. As a direct and proximate cause of one or more of the aforesaid defective and unreasonably dangerous conditions in the MAX airplane, the crashes of JT610 and ET302 occurred, and thereafter the damaging, but predictable and foreseeable, regulatory response to ground the MAX ensued.

146. By reason of the foregoing, the MAX was an unreasonably dangerous and defective airplane and BOEING should be held strictly liable for the damages sustained by the Plaintiff and the members of the Class.

147.    As a direct and legal result of the foregoing, the Plaintiff and the members of the respective Class have suffered, and will continue to suffer, pecuniary damages, including loss of wages and flight time, medical expenses, and severe emotional suffering.

## COUNT 2 – NEGLIGENCE AND WILLFUL AND WANTON CONDUCT

148.    The Plaintiff hereby incorporate and reallege each of the preceding paragraphs as though fully set forth herein.

149.    At all relevant times, BOEING owed a duty to the pilots, as ultimate operators of BOEING products, including Plaintiff, to use reasonable care in designing, manufacturing, assembling, testing, maintaining, servicing and selling the MAX, plus training instructors of airlines and its own staff who deliver training to BOEING pilot trainees, so as to not cause the MAX to be unsafe and not operational.

150.    BOEING negligently, with conscious disregard and reckless indifference, breached its duty of care owed to pilots flying the MAX through one or more of the following acts and omissions set forth above and herein.

151.    Upon information and belief, the System Safety Analysis (the "SSA") of the MCAS performed by BOEING, which was utilized by the FAA in its certification of the flight control system on the MAX, contained multiple understatements and omissions related to the system's automated capabilities:

  a. The SSA significantly understated the MCAS's authority to command the number and length of trim movements affecting the horizontal stabilizer;

  b. The MAX was capable of moving the airplane's horizontal stabilizer more than four times farther than originally indicated in the SSA, causing flight conditions that would be nearly impossible for pilots to manually fight against due to aerodynamic forces on the horizontal stabilizer;

c.  The SSA failed to account for the fact that the MCAS was designed so that it would reset itself after the Pilot countermanded the MCAS automatic nose down trim, thereby ignoring the real and not far-fetched possibility that the plane's nose would be pushed down repeatedly based on the erroneous data supplied by a single failed AOA sensor;

d.  The SAA failed to disclose that the MAX design violated a fundamental rule in airplane design that a single point of failure should not cause an aviation disaster;

e.  The SAA failed to disclose that the MAX was not designed with redundant systems, so that the failure of one system cannot cause an aviation disaster; and

f.  The SSA assessed potential MCAS failure as "hazardous," a classification that should have precluded certification for a design which allowed the MCAS to activate based on input from a single sensor, without cross-checking the data against the data supplied by another AOA sensor or otherwise verifying potentially erroneous data.

152.  BOEING negligently failed to provide the Plaintiff and the members of the respective Classes, with sufficient guidance and instruction regarding procedures to regain control of an airplane endangered by the MAX's Design Defects in the CBT, the FCOM, training materials, or bulletins.

153.  BOEING knew it was in contravention of their obligations of safety to Plaintiff and the flying public as evidenced by, among other things, BOEING's now publicly-disclosed (between October 2019 and January 2020 as referred to above) internal emails sent and received by BOEING employees.

154.  Through NASA's Aviation Safety Reporting System, which allows anonymous reports, one MAX captain said and Plaintiffs also allege that "The Flight Manual is inadequate and almost criminally insufficient."

155.  BOEING's conduct amounted to gross negligence and demonstrated a wanton disregard for the safety of the pilots and crew and all passengers it exposed to the defects of the MAX.

156.  Strong public policy supports the imposition of punitive damages against BOEING because:

36

a. BOEING intentionally, recklessly and negligently designed and added an unsafe feature to the MAX because adding that feature was a cheap, easy way to mask the airplane's inherent aerodynamic problems;

b. BOEING's intentional, reckless and negligent actions throughout the design, manufacture and certification process of the MAX demonstrated time and time again that BOEING knowingly put its financial interests ahead of aviation safety;

c. The JT610 and the ET302 disasters were not enough to move BOEING to admit that the MAX was unsafe and recommend that its customers and aviation regulators worldwide immediately ground their MAX airplanes;

d. Even after ET302, BOEING continued to fight against grounding the MAX, causing airlines to put their pilots, crews and passengers at risk for several days until the weight of enormous international public pressure forced the FAA to ground the airplane;

e. BOEING continues to deny that it made mistakes in its design and manufacture of the MAX, or in the insufficient training it created and permitted to be given to pilots, and refuses to admit that the MAX is defective, even as it works to fix the design defects proven to have caused two aviation disasters with attendant loss of life, and the grounding of the MAX worldwide;

f. Mr. Muilenburg publicly admitted that Boeing "owns" the responsibility to correct the MCAS software, and knows how to do it, yet refuses to admit that the MCAS software was unsafe;

g. BOEING has announced that it will seek to remove pending cases filed by the families of the victims of JT610 and ET302 in Chicago, Illinois to Indonesia and Ethiopia, respectively, in a shameless, disrespectful, and insulting effort to minimize compensation to the families of those whose relatives were killed by BOEING's negligent design and inaction before and after the devastating crashes of JT610 and ET302; and

h. BOEING continues to be led by many of the same officials who approved the MAX project, who rushed the design and manufacture of the airplane and who continue to deny the existence of problems with the MAX or properly respond to the tragic events which revealed that the airplane's MCAS was a deadly defect.

157. By reason of the foregoing, the MAX was an unreasonably dangerous and defective airplane that inevitably had to be taken out of operation, and BOEING should be held liable for the damages and abuses sustained by the Plaintiff and the members of the Class.

158.     As a direct and legal result of foregoing, the Plaintiff and the members of the Class have suffered, and will continue to suffer, pecuniary damages, including loss of wages and flight time, medical expenses, relocation expenses, and severe emotional suffering.

## COUNT 3 – FRAUDULENT CONCEALMENT

159.     The Plaintiff incorporate and reallege each of the paragraphs set forth above as though fully set forth herein.

160.     A fiduciary and/or special relationship exists between BOEING and Plaintiff because, among other things, Plaintiff literally entrust their lives and careers, and the lives of their passengers and other crew, to BOEING and the training and information provided by BOEING and its agent airlines.

161.     Plaintiff was entirely reliant on BOEING to provide accurate information about the systems on the MAX and how to manage them in cases of malfunctions or failures. The quality and reliability of this information is expressly related to whether or not a pilot will participate in training to fly a new aircraft like the MAX.

162.     BOEING created and cultivates this special relationship because it relies on BOEING-certified pilots, like Plaintiff, to chose to fly BOEING-type planes, to the exclusion of other aircraft types, e.g., Airbus, and assure the traveling public that BOEING planes are safe.

163.     Plaintiff necessarily relied on the training and information provided by and through BOEING and when he made the important career decision to qualify to fly and to fly the MAX to the exclusion of other career opportunities.

164.     On the numerous occasions set forth herein, BOEING actively and deliberately concealed from Plaintiff that BOEING knew about the design flaws, that the FAA would not have

certified the MAX but for BOEING's concealment of the design flaws, and that the FAA would ground the MAX if and when the design flaws were discovered.

165. On the numerous occasions set forth herein, BOEING actively and deliberately concealed from Plaintiff the material fact that the MAX violated FAA's Airworthiness Standards for Commercial Aircraft, 14 C.F.R. Sec. 25.203(a) – Stall Characteristics, and that the MAX should have never been certified by the FAA.

166. On the numerous occasions as fully set forth herein, BOEING actively and deliberately concealed from Plaintiff the existence of the design flaws of the MAX, including but not limited to the MCAS, its propensity to malfunction, and the fact that there was no way to safely manage a malfunction of the MCAS, and that the assumptions BOEING made regarding safe response to an MCAS malfunction as introduced by TBC-19 after the crash of JT610 were insufficient for pilots' needs; each of which was a material fact.

167. BOEING had knowledge of the material facts set forth above at least as early as 2016. Further, as at the date of this Complaint, no aviation safety regulator worldwide has been satisfied by BOEING that the design flaws have been corrected by any "fix" including TBC-19.

168. BOEING was under a duty to disclose the material facts to the Plaintiff through general public representations made to pilots and through direct CBT and other training to fly the MAX.

169. The material facts were not within reasonably diligent attention, observation, and judgment of Plaintiff. As the designer and manufacturer of the MAX, BOEING alone had access to the systems on the MAX, their operation, and how to manage any malfunctions.

170. BOEING actively and deliberately concealed the material facts with the intention to mislead Plaintiff as to the true condition of the MAX and instead used opportunities to conduct CBT

and other training on the MAX to highlight certain commercial and design efficiencies it sought to induce pilots, including Plaintiff, to fly the MAX so that BOEING could sell more planes.

171.    Plaintiff was reasonably misled by BOEING's concealment of material facts, including during their training to fly the MAX.

172.    Plaintiff justifiably relied on BOEING's concealment of the material facts by undergoing or completing training to qualify to fly the MAX and foregoing certification on other aircraft types and other job opportunities.

173.    BOEING knew that had it disclosed any of the material facts, the FAA would not have certified the MAX and Plaintiff would not have undergone or completed training to qualify to fly the MAX.

174.    BOEING was unjustly enriched by its concealment of the material facts.

175.    As a direct and legal result of BOEING's concealment, Plaintiff and the members of the Class have suffered, and will continue to suffer, pecuniary damages, including loss of wages and flight time, medical expenses, relocation expenses, and severe emotional suffering.

## COUNT 4 – FRAUDULENT MISREPRESENTATION

176.    The Plaintiff hereby incorporate and reallege each of the preceding paragraphs as though fully set forth herein.

177.    Specifically, the Plaintiff hereby incorporates the specific representations and omissions made by BOEING to the Plaintiff set forth in paragraphs 4-7 well as the representations and omissions made by BOEING in the FCOM, TBC-19, and the CBT set forth herein.

178.    A substantial part of BOEING's business is providing information to pilots so that they can make important career decisions, e.g., which aircraft to seek certification.

179.    BOEING represented to the Plaintiff that the MAX could be safely operated.

180.    BOEING failed to disclose to Plaintiff in the FCOM, on each date that it published and the Plaintiff reviewed the FCOM, that the MCAS was incorporated on the MAX and could under certain conditions cause the plane to crash.

181.    BOEING failed to disclose to Plaintiff in the FCOM, on each date that it published and Plaintiff reviewed the FCOM, that the design of the MAX provided that a single-point of failure to lead to a crash of the MAX.

182.    On the date that the Plaintiff qualified to fly the MAX, BOEING represented to the Plaintiff that MAX pilots did not need additional substantive (including simulator) training or testing to fly revenue-generating flights.

183.    On each date that it published and revised the FCOM, BOEING represented to Plaintiff that the FCOM contained the most current information known to BOEING.

184.    On each date that it published the FCOM, BOEING omitted any information about the MCAS.

185.    On each date that it published the FCOM, BOEING omitted procedures to safely manage a malfunction of the MCAS and/or failed to disclose that such procedures do not exist.

186.    On each date that it published the FCOM, BOEING omitted to provide recommendations for simulator training to handle operation of and management of malfunctions of the MCAS.

187.    BOEING's representations and omissions were false and misleading.

188.    The Plaintiff relied on BOEING's material representations and omissions by qualifying to operate and operating the MAX, and by foregoing opportunities to operate other aircraft types.

189.    BOEING knew or should have known that the Plaintiff would rely on its representations and omissions.

41

190.    BOEING made the misrepresentations and omissions with malice and with knowledge that the statement was false or with a reckless disregard as to the veracity of the statement or omission.

191.    BOEING made the misrepresentations and omissions with the intention of inducing the Plaintiff to act.

192.    BOEING's misrepresentations and omissions were a proximate cause for the damages suffered by the Plaintiff.

193.    As a result of BOEING's representations and omissions, the Plaintiff is left to wonder what else BOEING has failed to disclose.

194.    The Plaintiff's confidence in operating BOEING aircraft has forever irrevocably been diminished in circumstances where BOEING is one of only two major civil airline manufacturers supplying airliners of the kind operated by the preponderance of global Airlines.

195.    As a direct and legal result of BOEING's misrepresentations and omissions, BOEING was unjustly enriched as it was able to sell MAX aircraft that it knew were defective.

196.    As a direct and legal result of BOEING's misrepresentations and omissions, the Plaintiff and the members of the Class have suffered, and will continue to suffer, pecuniary damages, including loss of wages and flight time, medical expenses, relocation expenses, and severe emotional suffering.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, the Plaintiff prays:

a.   that the Court determine that this action may be maintained as a class action(s) pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.   that the Plaintiff is a proper class representative of the Class;

c.   that the best practicable notice of this action be given to members of the Class represented by the Plaintiff;

    d.   that judgment against the Defendant be entered in an amount to be determined at trial for compensatory damages alleged, plus in an amount to be determined at trial for punitive damages;

    e.   that interest, litigation costs, and attorneys' fees are awarded; and

    f.   that the Court grant such other and further relief as is just.

## <u>JURY DEMAND</u>

The Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted by:

Patrick M. Jones, One of the Attorneys
for Plaintiff and the Proposed Class

PMJ PLLC

Patrick M. Jones
Sarah M. Beaujour (admitted *Pro Hac Vice*)
100 South State Street
Chicago, Illinois 60603
Tel: (312) 255-7976
Email: pmj@pmjpllc.com
Email: sb@pmjpllc.com

and

IALPG PTY LTD (t/as International Aerospace Law & Policy Group)

Joseph C. Wheeler (admitted *Pro Hac Vice*)
Karina D. Galliford (admitted *Pro Hac Vice*)
1D, 7/139 Junction Road
Clayfield, Queensland, Australia 4011
Tel: +61 7 3040 1099
Email: jwheeler@ialpg.com
Email: kgalliford@ialpg.com

Attorneys for Plaintiff and
the Proposed Class